GOW et al. v. WILLIAM W. BRAUER S. S. CO.

(District Court, S. D. New York. January 14, 1902.)

1. ADMIRALTY—WRONGFUL ARREST OF VESSEL—DAMAGES.

While ordinarily the arrest of a vessel in a cause of damage by due process is an inconvenience to which the owner is required to submit, without remedy, upon his success in the action, beyond the recovery of costs, yet when the libelant proceeds without an honest belief that he is using a rightful remedy, and his action is in the nature of a malicious prosecution, he should be held to pay any damages sustained by the owner through his wrongful act.

2. SAME.

The charterer of a ship for two voyages, the hire to be paid by the month, on the completion of the vessel's discharge after the second voyage, and before her actual redelivery, caused her arrest on a libel filed against her asserting a claim against the owner. At the time the charterer was concededly indebted to the owner for hire under the charter in a sum exceeding that claimed in his libel. *Held*, that the arrest was made in bad faith, and by an abuse of the process of the court, and that the charterer would be held to the payment of hire under the charter to the time when the vessel was released from such arrest.

3. SAME—SUIT ON CHARTER—PLEADINGS AND ISSUES.

A libel by a shipowner against a charterer to recover charter hire gives the admiralty court jurisdiction over the entire contract, and it will inquire into all its breaches, and award all the damages suffered thereby, although such breaches were not all specifically alleged in the libel, but some occurred after it was filed. A libel to recover charter hire for a month in advance, where the charterer redelivered the vessel within the month, sufficiently raises the issue as to when such redelivery was made.

4. SHIPPING—CHARTER—CARGO SPACE.

Evidence *held* insufficient to sustain the claim of a charterer to damages because of an alleged warranty or representation that the cargo space of the ship was greater than it in fact was, no complaint or claim on that account having been made at the time of loading, nor until after the completion of the two voyages for which the ship was chartered.

5. SAME—COMMISSION ON ADVANCES BY CHARTERER.

A charterer is entitled to the stipulated commissions on advances made for the disbursements of the vessel upon entering on the charter, although she then had coal in her bunkers of equal or greater value, which the charterer was bound to take and pay for, where the advances were actually required and made before an adjustment could be made of the amount due for coal.

In Admiralty. Suit to recover charter hire.

Convers & Kirlin, for libelants.

Warren, Warren & O'Beirne, for respondent.

ADAMS, District Judge. This is an action brought to recover $7,493.85, the hire of the steamship Ventnor for the month commencing June 18, 1901, alleged to be due under a charter party

made in the city of New York the 13th day of February, 1901, between the parties hereto, respectively owners and charterer, which provided for a monthly hire of £1,575, payable in advance, of which amount the said sum of $7,493.85 is the equivalent. The hiring was for two round trips between "U. S. Atlantic port or ports and Europe," and to commence on the day of delivery to the charterer at a United States Atlantic port north of Hatteras, which delivery was duly made on the 18th day of March, 1901, at 10 o'clock a. m., and to continue until redelivery to the owners upon the completion of the second trip at a similar port. Payments were duly made for the hiring prior to the 18th of June. At the time of filing the libel—June 26, 1901—the steamer had begun the second trip, and was on her way towards Philadelphia, the port of return delivery. The charter party provided:

"(5) That should the steamer be on her voyage towards the port of return delivery at the time a payment of hire becomes due, said payment shall be made for such a length of time as the owners or other agents and charterers or their agents may agree as the estimated time necessary to complete the voyage, and when the steamer is delivered to owners' agents any difference shall be refunded by steamer or paid by charterers, as the case may require."

The parties were unable to reach an agreement under this clause, and the action was brought on the theory that another month's hire became due. Tonnelier v. Smith, 2 Com. Cas. 258. The steamer subsequently arrived at Philadelphia, and completed the delivery of her inward cargo there in the afternoon of July 4, 1901, but was immediately arrested under process issued upon a libel filed on the 3d day of July by the charterer in the United States district court for the Eastern district of Pennsylvania, alleging that the vessel had failed to comply with the terms of the charter party. The eighth clause provided:

"That the whole reach of the vessel's holds, decks, and usual places of loading, and accommodation of the ship (not more than she can reasonably stow and carry), shall be at the charterers' disposal, reserving only proper and sufficient space for ship's officers, crew, tackle, apparel, furniture, provisions, stores, and fuel."

The charterer claimed damages under the clause to the extent of $966.24. The libel also contained another claim against the ship for delay at the port of Hamburg owing to sufficient steam not being furnished to run the winches, in conformity with the twenty-fourth clause of the contract, and asking damage in such respect in the sum of $512.40. The vessel remained in custody under the seizure until the next day, when she was voluntarily released. These same matters set up in the Philadelphia libel are alleged by the charterer in its answer in the case at bar, excepting that the damages claimed for the ship's failure to furnish cargo space are $971.84, instead of $966.24. Additional offsets are also claimed in the answer for coal remaining in the bunkers of the steamer at the time of redelivery, which the owners were to pay for under the contract, amounting to $458.20; for sundry disbursements made at the return port upon the request of the master of the vessel, amounting to $14.55; for disbursements made on behalf of the vessel at Ham-

113 F.—43

burg, amounting to $699.92; and for an address commission of 2½ per cent. The libelants herein admit the coal claim, $458.20, the disbursement claim of $14.55, and the address commission claim. No proof was offered by the respondent to sustain the claim of $512.40, loss of time at Hamburg, and it has been abandoned. The claim of $699.92 for disbursements at Hamburg was paid by the libelants there. There is a claim made by the libelants for $18.18 deducted by the respondent as a commission on advances alleged to have been made on the first voyage. It was admitted by the respondent on the trial that hire was due up to July 4th, and such hire has been proved to amount to $4,163.25. There are now, therefore, three matters in controversy, viz.: (1) Whether the hire should be computed up to July 4th, when the vessel was free from cargo, or to July 5th, when she was released from custody; (2) whether the respondent has an offset by reason of not receiving all the cargo space it was entitled to; (3) whether the libelants are entitled to recover the sum of $18.18, deducted by the respondent from the hire for the first voyage.

1. It does not appear that there was any actual notice of a redelivery of the steamer on the 4th of July. Nor were there any steps taken by the respondent to indicate an intention on its part to terminate its relations to the steamer. Doubtless a redelivery would have been effected by operation of the provisions of the charter party when the inward cargo was discharged, and the hiring would have been in fact then terminated, in the absence of any act by the respondent to prevent it; but, instead of permitting the owners to resume possession, the respondent invoked the process of the court to prevent it, and by such means actually detained the vessel 25 hours beyond the time when the owners would otherwise have taken her back. At this time the respondent admittedly owed the libelants $4,163.25, less a deduction of 2½ per cent. address commission, amounting to $104.08, or $4,059.17. The respondent's claims against the steamer or the steamer's owners then were the sums mentioned in the Philadelphia libel, $966.24 and $512.40. The only other claims which it has at any time pretended to have were, respectively, $458.20, $14.55, and $699.92, as hereinbefore described, and the additional $5.60 on the cargo space claimed, aggregating, with the libel claims, $2,656.91. The respondent, therefore, when it caused process to be issued and the vessel arrested, was, according to any possible computation, actually in debt to the libelants some $1,402.26. Under the circumstances it is claimed by the libelants that the hire should continue during the 25 hours the vessel was under seizure. While the ordinary arrest of a vessel in a cause of damage, security for costs having been given by the libelant, is an inconvenience to which the owner is required to submit without a remedy, upon his success in the action, beyond the costs, yet where the libelant proceeds without an honest belief that he is using a rightful remedy, and his action is in the nature of a malicious prosecution, he should be held in any damages suffered by the shipowner through his wrongful act. The Walter D. Wallet [1893] Prob. Div. 202; The Adolph (D. C.) 5 Fed. 114; Kemp v. Brown (D. C.) 43 Fed. 391;

The Alex Gibson (D. C.) 44 Fed. 371, 374; The Wasco (D. C.) 53 Fed. 546. The facts here conclusively establish that the respondent could not have proceeded against the steamer in good faith. If all the facts of the transaction known to the respondent had been stated in the most favorable manner, it would have appeared on the face of the libel that nothing was due, and process could not properly have been issued. The arrest of the steamer was obtained by a suppression of the facts, and the proceedings on the part of the respondent were mala fide, and an abuse of the process of the court. The respondent contends, in this connection, that the libelants' claim is not properly raised by the pleadings, and is not in issue. I think that a libel claim for a month's hire sufficed to raise the question, which has been so litigated that the respondent has had ample opportunity to present any defense it wished to make. There does not seem to be any dispute about the facts, and, if my views are correct with respect to the law, it seems that I should grant the relief. The contract is maritime, and the court "having jurisdiction over the entire contract, it will proceed to inquire into all its breaches, and all the damages suffered thereby, however peculiar they may be, and whatever issues they may involve." Church v. Shelton, 2 Curt. 271, 5 Fed. Cas. 675 (No. 2714). And see The Electron (D. C.) 48 Fed. 689, 690; The Normannia (D. C.) 62 Fed. 469, 472; Boutin v. Rudd, 27 C. C. A. 526, 82 Fed. 685, 686. I hold, therefore, that there was no proper redelivery of the steamer on the 4th of July, but that the hire continued to the 5th of July, when the steamer was released from custody. The hire to such time amounts to $4,430.12, from which should be deducted an address commission of 2½ per cent., —$110.75,—leaving a balance of $4,319.37.

2. The claim of the respondent in this respect is stated in the answer as follows:

"Seventh. That at the time of the making of the charter party the said steamship Ventnor was in the United Kingdom, and was unknown to the respondent, except by name. That the libelants, by their duly-authorized agent, warranted and represented to this respondent that the space to be occupied by cargo in the said steamship and as shown on her plans in the peaks, lazarette, and poop was 16,565 cubic feet, all of which, reserving only proper and sufficient space for the ship's officers, crew, tackle, apparel, furniture, provisions, stores, and fuel, should have been at the disposal of the charterers; that a proper and sufficient space for these purposes would be 4,000 cubic feet; that said plans showed the upper forepeak of said vessel was of the cargo carrying capacity of 2,023 cubic feet, that the intermediate forepeak and lower forepeak was of the cargo carrying capacity of 4,421 cubic feet, that the afterpeak was of the cargo carrying capacity of 2,372 cubic feet, and that her poop was of the cargo capacity of 7,349 cubic feet,—in all 16,565 cubic feet. And relying upon such warranty and representation, and believing the same to be true, entered into the charter party marked 'Exhibit A,' annexed to the libel herein."

It was assumed that the terms of the clause 8, covering the contention, opened the door for proof as to the quantity of space the charterer was entitled to, exclusive of that which belonged to the ship for stores, etc., and full opportunity was given the respondent to prove all the circumstances relating to the matter, including representations prior to the contract; but nothing was elicited tending to show the

representations claimed. It appeared that the owners' agent in the negotiations gave a card to the respondent's agent on which the estimated general capacity of the vessel was stated, but it was also stated thereon that such particular was "believed correct, but not guarantied." It was after the contract was executed that a plan of the vessel was sent to the respondent, and it is upon such plan, and some plans made by the respondent's agents, that the claims are made. There was, therefore, no guaranty or warranty of space, and the question is whether the terms of clause 8 were complied with. There is testimony on the part of the respondent tending to show that it did not get all the space its agents thought they ought to have had, and for which they applied to the officers of the steamer; but such testimony is denied in substance by the officers of the steamer, who say that no such demands were made upon them, but that, on the contrary, the whole control of the loadings of the steamer was under the charterer's agents, as provided by clause 9 of the contract, to the effect that the captain should be under the orders and direction of the charterer as regarded "employment, agency, or other arrangements," and that the entire capacity of the steamer was at the charterer's disposal, excepting proper reservations for the ship's stores, not exceeding about the quantity conceded by the charterer, even excluding some latitude which the master could reasonably have exercised in the matter. Upon consideration of the testimony, some of which I heard, I do not feel inclined to allow the claim. In the midst of the conflict probabilities intervene which are persuasive against the respondent. For example, after the loading for the first voyage was completed (the claim embraces both voyages) the respondent made no claim in respect to deprivation of space, but on the 21st of March wrote to the master of the steamer, "Your vessel being now loaded, please proceed to the port of Hamburg." After the loading for the second voyage was completed, similar sailing orders were given containing the expression, "Your vessel being loaded." There was no protest to the owners on either occasion, nor anything to indicate positive dissatisfaction at such times, and there is ground for reasonable belief that the whole claim is a resuscitation for the purposes of a legal dispute of some controversies between the officers of the steamer and the respondent's loading agents, which, if of serious existence, were abandoned. I therefore disallow it.

3. The claim of the libelants for $18.18 alleged to have been improperly deducted from the hire by the respondent, I do not allow. It was not made a subject of contention by the pleadings, and, in any event, is not sufficiently established. It arose out of charges made for advances to the steamer on her first entry to the port of Philadelphia. The testimony shows that the advances were actually made by the charterer for the steamer's disbursements, but it is contended that the ship then had coal in her bunkers, which the charterer was bound to pay for when the ship arrived, and that it was therefore in funds to pay the claim out of the owners' money. There is some plausibility in the claim, but the difficulty is that the disbursements seem to have been made before any adjustment could be made of the amount due for the coal. The money was paid out by

the charterer before it was under any obligation to pay for the coal, and, I think, became a proper subject for a commission charge.

Decree for the libelants for the sum of $3,846.62, with interest and costs.