THE SEGURANCA.

GUIMARAES et al. v. PROCEEDS OF THE SEGURANCA.

(District Court, S. D. New York. May 2, 1895.)

NONDELIVERY OF OIL CARGO—LEAKAGE—LIGHTERAGE—SHIPPER'S RISK — GOVERNMENT CUSTODY—CONSIGNEE'S LACHES — CUSTOM HOUSE REPORT NOT EVIDENCE.

    Five thousand cases of oil were deliverable at Rio in lighters at shipper's risk; the local regulations required it to be put in the custody of customs officers till the duties were paid. The consignees, though duly notified of the ship's delivery in lighters to the customs authorities, delayed for nine weeks to pay the duties and take the oil ashore, and then claimed nondelivery of 1,132 cases, and loss and damage to other cases. The ship proved delivery into lighters and to the government officers of all the oil save 102 cases broken: *Held*, that the delivery to the officers in lighters was a good delivery, and that the ship was responsible only for loss by breakage and from leakage for a reasonable time in which to pay the duties and land the goods; that the custom house report of missing cases nine weeks after, was not competent evidence of nondelivery; and that upon the whole evidence a loss of 250 cases only was chargeable against the ship.

This was a libel by Zelmira de Castro Guimaraes, and others, against the proceeds of the steamship Seguranca, to recover for alleged loss and damage upon a consignment of oil in cases.

Cary & Whitridge and W. P. Butler, for petitioners.
Carter & Ledyard and E. L. Baylies, for mortgagee of steamer.

BROWN, District Judge. The above libel was filed against the proceeds of the steamer Seguranca deposited in the registry of this court, for the recovery of an alleged loss and damage of part of a consignment of 5,000 cases of oil shipped from New York to Rio on board the Seguranca in January, 1893. The claim is contested by the Atlantic Trust Company, a mortgagee of the vessel, which claims the proceeds in the registry.

The petition alleges the nondelivery of 1,132 cases out of the 5,000; that 1,005 other cases were damaged, so that a part of contents was lost; and that 209 cans were delivered without the wooden cases which should have inclosed them.

The steamer arrived at Rio in February, and owing to her draft of water, her cargo had to be discharged by lighters. The cases of oil being inflammable, were required, under the local authority, to be delivered at the government warehouses, unless at once removed and the duties paid. The twelfth clause of the bill of lading for the oil in question provided, that it should be "lightered ashore at shipper's risk, but at company's expense, provided it did not lie in lighters or hulks for longer than 48 hours after it is discharged into said lighters, and for demurrage thereafter." The oil was all discharged from the ship into lighters by the 24th of February; and there is general testimony on behalf of the ship from those who took part in the delivery, and superintended it, that all the oil was delivered into the lighters in accordance with the manifest, and that

only 102 cases were broken, and that some were so injured that the tin cans were sent without being inclosed in wooden cases.

The lighters were small boats, about 35 feet in length, which were towed by tugs procured by the steamer, and put in charge of the government customs officers at the Registro or Trepeche, as required by the local regulations for such cargo. No men were on board the lighters, either during transportation, or when left at the Registro or Trepeche; but the boats remained in sole charge and control of the government officers until the duties were paid and the goods landed. Before the discharge of the cargo, the petitioners, as well as other consignees of the cargo, had been notified by the officers of the vessel of the arrival of the ship, with the request that they should receive the goods at once. On February 28, a letter was sent by Mr. Burt, the ship's agent, to the petitioners, calling attention to the fact that the lighters were already on demurrage for their failure to unload. The oil was allowed to remain by the petitioners in the care of the customs authorities for about nine weeks until the 29th of April, when it was discharged from the lighters; and at that time, as is alleged by the petitioners, the loss and damage were as above stated.

1. I am of the opinion that the evidence in favor of the petitioners is not sufficient to show nondelivery of the 1,132 cases. Under the peculiar circumstances of this cargo, and the regulations and customs of the port of Rio, and the provisions of the bill of lading, I think the ship is responsible only for a good delivery into the lighters, and to the customs authorities. But aside from this consideration, and saying nothing of the interval of nine weeks which elapsed between the discharge of the cargo by the ship into the lighters, and the discharge on shore under the customs authorities, there is no competent legal evidence showing that there was any shortage in the number of cases finally delivered on shore, except the 102 cases above referred to. No witness for the petitioners is produced who tallied or counted the cases received. The testimony of Mr. Carregal rests entirely on an alleged account rendered by the customs authorities of the amount discharged on shore; while that account is not produced, and the customs officers, whose testimony was sought to be taken by commission, refused to testify. The testimony of Mr. Carregal, upon cross-examination, shows that his previous statements were hearsay only. The only count which the petitioners' clerk Doerzapff testified to, is a count of 209 empty tins, placed in a lot by themselves. As against the general testimony for the ship of a discharge, in good order, in accordance with the manifest, except 102 cases, the burden of proof to show shortage was on the petitioners.

2. As respects the 1,005 alleged to be damaged, Doerzapff testifies that "a count of them by weight by the customs authorities made of that lot 287 cases empty." Allowing this statement as evidence, it would show that the loss on the 1,005 cases was equivalent to a loss of 287 cases of oil, besides the 209 empty cans before referred to. These two items spoken of by Doerzapff would embrace the 102 cases (204 cans) referred to by the ship's officers.

If the ship, therefore, was responsible for the condition of the oil at the time when it was discharged from the custom house, the petitioners would be entitled to recover for 287 cases and 209 cans. But as the bill of lading expressly provided that the lighterage should be "at shipper's risk," and evidently contemplated the removal of the cases within two days after they were placed on the lighters, and as they were nevertheless suffered by the consignees to remain upon the lighters for upwards of nine weeks in open boats, some of the cases in a leaking condition, wholly exposed to the weather and to the corrosion of salt water and rain water, which Mr. Burt's testimony proves must have injuriously affected them, any loss or damage that may have been suffered through these causes during this extraordinary, and apparently inexcusable, delay by the consignees, cannot be charged upon the ship, since the latter had no control over the custody or delivery, and the exception of "lighterage at shipper's risk" must include all damage or loss while on the lighters without the ship's fault. As I have already said, so far as the direct testimony goes, there is no evidence that the cargo was delivered upon the lighters in a bad condition beyond the 102 cases, as testified to by the ship's officers; and beyond this, no fault on the ship's part is shown. Supposing that some of the cans were leaking at the time when put upon the lighters, still the extraordinary delay by the consignees in subsequently entering and receiving their goods was at their risk; and no continuance of leakage could be charged upon the ship after the lapse of a reasonable time for the petitioners to get the goods from the lighters through the custom house authorities. The evidence, as I understand it, shows that the ship had no power whatsoever over the final delivery; and under the terms of the bill of lading, therefore, the ship was not responsible for what happened upon the lighters from such delay, whether caused by the custom house authorities, or purely by the confessed inactivity of the petitioners themselves.

There are no definite data in the evidence for determining with precision how much of the loss of 287 cases of oil in quantity, should be charged to the ship, and how much to the petitioners' delay. Whatever damage was done on board of the steamer, or during the discharge into the lighters by the stevedore employed by the ship, must be charged against the steamer, as well also as such additional loss of oil as would arise after the discharge upon the lighters by leakage, through the previous damage to the cases until the lapse of a reasonable time for the receipt of the goods by the consignees from the custom house authorities. Upon the whole testimony, the best estimate and allowance I can make for the leakage and loss chargeable to the ship, is for 500 cans, i. e., 250 cases, the value of which was $1.25 per case, for which, with interest from April 29, 1893, the petitioners may enter a decree, with costs.